STATE *v.* GRAND TRUNK RAILWAY.

In an action for negligence, the question of due care is generally for the jury to determine; but where the uncontroverted facts show negligence on the part of the person injured and there is no evidence tending to show negligence on the part of the defendant, the law requires the jury to return a verdict for the defendant.

INDICTMENT, under G. L., c. 282, s. 14, for killing John E. Willis. The defendant is proprietor of the railroad running through Milan. January 20, 1877, Willis was struck by the defendant's locomotive, near the West Milan station, and killed. On that day, and for a long time before and ever since, the defendant run and operated a train of freight cars with a passenger car attached, called a mixed train. The train usually consisted of from twenty to twenty-five freight cars, besides the van, locomotive, and passenger car, and passed the West Milan station, going east, at 1 p. m. On the day in question, there were in the train twenty freight cars, besides the van and passenger car. This train did not stop at West Milan unless signalled for passengers, or there were passengers to leave, which did not occur more than three or four times a week. The grade of the road where it passes the station rises toward the east at about sixty feet to the mile, and, that the trains might start without first running back, it was customary to run the freight trains, including this mixed train, past the station before stopping, to a point east of the station, where the grade was less, or nothing. The mixed train generally stopped so that the passenger car at the rear was near the station, or somewhere between the station and a point three hundred and fifty or four hundred feet further east, when passengers taking this train would walk up the railroad to where the car stopped. Sometimes they would go up the road some distance before the train arrived, and wait for it. Sometimes they were requested by the agent at the station to go before the train came, so as not to delay it in

waiting for them to come up. A side track, at a distance of eight feet from the main track, extended from a point some four hundred feet west of the station to an equal distance east of the station. In passing the station, and for some distance beyond, the track curved sharply to the north. A highway crossed the track from a point just east of the platform of the station-house, diagonally, to the south-east, on the north side of the main track. About ninety-five feet east of the highway crossing was a hand-car house, with planking extending from its doors to the main track, and on about the same level. The snow was cleared from the main and side tracks, and no car was standing on the side track. North of the main track, and for a distance of about eighty feet east of the crossing, the snow had been shovelled out down to near the sleepers for a space of forty-four inches in width from the north track, leaving a bank of snow outside nearly perpendicular, and from three to three and a half feet high. On that day the snow was soft, and the evidence was that a man could "without difficulty" step upon and over the snow-bank. Further east the snow was as left by the snow-plow, the level space being twenty-six inches wide from the track, and the bank being more sloping than where it had been shovelled out. At the hand-car house, a path from three to five feet wide had been shovelled from the track to the easternmost door. The snow between the main and side tracks was from one to one and a half feet in depth, being deepest midway between the tracks. On the day of the accident the mixed train was on time. Willis came to the station-house a half hour before the train, and requested the agent to signal it, as he wished to go upon it. He bought no ticket. When the whistle of the train was heard, Willis and the agent went out upon the platform, the agent going a little west to set the signal, and Willis starting east. The agent told Willis that the train would have to go by the station in order to start, but that Willis could wait till the train stopped, and then go up and get on. He passed upon the main track at the highway crossing when the train was near the west switch, about six hundred feet from him, and in sight. He walked on between the rails of the main track some sixty feet, when the engineer gave the danger signals, being several short, shrieking whistles, the locomotive then being near the east end of the station-house. When these signals were given, Willis turned his head, looked back, then went forward and turned from the track to the north side, crossing outside the north rail at a point about thirty feet west of the hand-car house, and then turned easterly and went on in the same direction, keeping within eighteen inches of the rail. When near the west end of the hand-car house, he was struck by the front cross beam of the locomotive, thrown forward against the snow-bank, fell or rolled down beneath the train, and was killed. The end of the beam which struck him was about eighteen inches outside the rail. The bell of the loco-

motive was rung while passing the station and crossing, and for some distance beyond. The engineer and fireman saw Willis on the track before the danger signals were given. After they were given and Willis turned from the track, the engineer could not see him from his position on account of the curve in the road, the smoke-stack and other projections upon the locomotive. The state's evidence tended to show that the train was running past the station at from fifteen to eighteen miles an hour. The defendant's evidence tended to show five to eight miles an hour. An order of the superintendent for the use of train hands forbade the running of trains past stations and crossings at a greater speed than six miles an hour. No attempt was made to stop the train until Willis was struck. There was no evidence that the train was intentionally, maliciously, or wantonly run upon Willis. For a distance of twenty feet after Willis crossed to the outside of the rails he was within the space where the snow had been shovelled out for a width of forty-four inches. For the remaining twelve or fourteen feet before he was struck he was in the narrower space of twenty-six inches wide with a more sloping snow-bank. At the time he went upon the track the train was in sight approaching, and from that time until the accident there was no obstruction to hide the train from him. The distance apart of the last three or four tracks, which he made, was greater than that of the others, the longest space being three feet seven inches, from which it is inferred that he was going faster just before he was hit than before. Willis was forty-nine years old, six feet two inches in height, and weighed one hundred and seventy pounds. He was in full health and strength, bodily and mentally. He was a deputy sheriff, and at the time of the accident was on the business of his office. He was acquainted with the station at West Milan and the surroundings, and with the train he proposed to take and the way it was operated there.

At the close of the plaintiff's evidence, the defendant moved for a verdict on the ground that there was no evidence of care on the part of Willis. The motion was denied, and the defendant excepted.

*Ladd & Fletcher* and *H. Bingham,* for the plaintiff.

*Ray, Drew & Jordan* and *G. A. Bingham,* for the defendant.

CLARK, J. Upon the facts stated, a jury could not reasonably or properly find a verdict for the state. There is no evidence that the defendant was negligent, or that the deceased was exercising ordinary care at the time of the injury. On the contrary, there is affirmative evidence of carelessness on the part of the deceased, and of the exercise of due care by the defendant.

It appears that the deceased was in full health and strength, bodily and mentally; that he was acquainted with the railway

station and its surroundings, and with the train he intended to take and the way it was operated there; that he was told by the defendant's station agent that the train would have to go by the station on account of the grade, but that he could wait till it stopped and then go up and get aboard; that knowing these facts he went upon the track when the train was approaching in plain sight about six hundred feet distant from him; that when the engineer gave the danger signals he turned and looked back, then turned and walked from the track on the north side; that there was nothing to prevent his going upon the side track on the south side of the main track, and no obstruction on the north side of the main track except a soft snow-bank which he could step upon and over without difficulty; and that he continued walking easterly on the north side of the track until he was struck by the end of the front cross-beam of the locomotive, which projected about eighteen inches outside the rail, and was thrown forward against the snow-bank, and fell or rolled under the train and was killed. Instead of disclosing any evidence of ordinary care and prudence, these facts show that the deceased lost his life through his own carelessness.

It is unnecessary to consider whether the deceased, having no passage ticket, should be regarded as a passenger, because, assuming that he was entitled to the rights of a passenger, there is no evidence tending to show that the defendant was in fault as a carrier of passengers. The train was run in the usual manner. The deceased knew it would pass beyond the station before stopping, and he was not misled. A safe means of access to the train was pointed out to him. He was told that he could go up the track, after the train had passed, to the passenger car, which was at the rear of the train. As a passenger, he had no right to go upon the track in front of the train unnecessarily, or to obstruct the passage of the train in any manner. When the engineer saw the deceased upon the track, the danger signal was given, the deceased heard it, turned and looked toward the train, and then passed from the track and out of the sight of the engineer. The engineer had no reason then to apprehend that the deceased was in any danger from the train. He saw that the signal was heard and apparently heeded, and having reason to think that the deceased had removed to a safe distance from the track, there was no occasion for stopping the train; and the defendant was in no fault because no attempt was made to stop it. Having warned the deceased of his danger, the engineer was justified in assuming that he would exercise ordinary care in avoiding the train after he left the track. There is no evidence authorizing a verdict that the death of the deceased was caused by the negligence of the defendant.

*Judgment for the defendant.*

ALLEN, J., did not sit: the others concurred.